IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**DAVID BIGGAR,**

    Plaintiff,

v.

**OREGON BOARD OF OPTOMETRY,** et al.,

    Defendants.

No. 3:17-cv-00714-MO

OPINION AND ORDER

**MOSMAN, J.,**

This matter comes before me on a Motion for Summary Judgment [93] filed by the Oregon Board of Optometry ("the Board"), several Board members, and the executive director of the Board (together the "OBO Defendants"). No party requested oral argument. For the reasons below, I GRANT in part the OBO Defendants' Motion for Summary Judgment, and, with only state law claims remaining, REMAND this case to Multnomah County Circuit Court.

## BACKGROUND

### I. Undisputed factual background

#### A. Events of Fall 2015–March 2016

Pro se plaintiff Dr. David Biggar has been an optometrist since 2006. Abrams Decl. [94] Ex. A (hereinafter "Biggar Depo.") at 9–10. In 2012, he opened Eyes of Oregon LLC, with an

1 – OPINION AND ORDER

office in Lake Oswego and an office in Tillamook. Biggar Depo. at 9–10. In 2015, Dr. Biggar and his wife divorced, and she retained custody of their children. Biggar Depo. at 73. In the months after the divorce, Dr. Biggar cried in front of patients and physically collapsed at the office. Biggar Depo., Ex. 110. Dr. Biggar stopped practicing optometry temporarily for about three months in Fall 2015 and checked himself into a mental health facility for five days in November 2015. Biggar Depo. at 73.

Dr. Joan Miller, an optometrist, former friend of Dr. Biggar, and previous defendant in this lawsuit, became concerned in early 2016 about Dr. Biggar's conduct. From January to March 2016, Dr. Biggar told Dr. Miller he wanted to have his organs harvested and thereby commit suicide, sent threatening emails to a prospective buyer of his clinic, Dr. Kim Clark, and failed to complete treatment records. Biggar Depo. at 72–73; *id.*, Ex. 107. In light of this conduct, Dr. Miller reported Dr. Biggar in an email to the Board on March 23, 2016.

Dr. Biggar's colleague, Dr. Scott Iburg, also reported Dr. Biggar to the Board on March 28, 2016, detailing Dr. Biggar's suicidal thoughts, his threats to hit or kill Dr. Clark, an incident in which Dr. Biggar screamed and swore at an employee while a patient was in the office, and harassing emails Dr. Biggar sent after Dr. Iburg resigned. Biggar Depo., Ex. 110. Dr. Iburg forwarded the Board an email on March 24 in which Dr. Biggar stated, "Alot [sic] of guys would have picked up a machine gun and gone dancing at the mall by now." Biggar Depo., Ex. 109. Dr. Iburg supplemented his report on March 29, 2016, to express his concerns that Dr. Biggar was not properly completing glaucoma charts. Biggar Depo., Ex. 111.

### B. March 2016 Board Actions

On March 30, 2016, the Board met at a specially called meeting to discuss the allegations against Dr. Biggar. Sneed Decl. [95] ¶ 2. For this meeting, the Board gave notice to the general public and specific notice to a list of people who previously requested notice of specially called

2 – OPINION AND ORDER

meetings. Sneed Decl. [95] ¶ 3. The Board directed its Executive Director, Defendant Shelley Sneed, to communicate with Dr. Biggar to obtain further information, but did not make any final decisions at the time. Sneed Decl. [95] ¶ 2.

Ms. Sneed then wrote two letters to Dr. Biggar on March 31, 2016. The first letter (Letter A) stated that because of "reports of inability to practice and making threats of harm to yourself and others, the Oregon Board of Optometry has opened an investigation into your fitness to practice." Biggar Depo., Ex. 112. Letter A also gave Dr. Biggar 48 hours to sign an Interim Consent Order by which he would have to agree to "stop practicing optometry until [his] mental health [was] assessed, a treatment plan [was] written by a professional, and [he] show[ed] a willingness and commitment to follow the treatment plan." Biggar Depo., Ex. 112. Otherwise, Letter A warned, the Board would undertake an emergency suspension of his Oregon optometry license. Biggar Depo., Ex. 112.

The second letter (Letter B) did not mention the Interim Consent Order or an emergency suspension. Biggar Depo., Ex. 113. Letter B requested Dr. Biggar send information about certain glaucoma records within 21 days of the letter. Biggar Depo., Ex. 113. Letter B also stated that Dr. Biggar would not hear from the Board right away, as the next Board meeting was not until May 6. Biggar Depo., Ex. 113.

Dr. Biggar declined to sign the Interim Consent Order included in Letter A, but did meet with Dr. Les Goldmann, a clinical psychologist, to have his mental health assessed. After a three-hour evaluation on April 1, Dr. Goldmann issued a report on April 4, stating that it was his opinion, "based upon the seriousness of the complaints, Dr. Biggar's inconsistent reporting as well as his lack of insight," that Dr. Biggar was not fit to practice optometry, at least in the "very short term." Biggar Depo., Ex. 114 at 7.

3 – OPINION AND ORDER

### C. April 2016 Emergency Orders

The next day, the Board issued an Order of Emergency Suspension (Emergency Order), detailing the allegations against Dr. Biggar and prohibiting him from practicing optometry until further notice from the Board. Biggar Depo., Ex. 115. Some of these specific allegations included Dr. Biggar's use of profanity in the office, his collapse in September 2015, and his failure to properly complete glaucoma charts. Biggar Depo., Ex. 118.

The Emergency Order stated that Dr. Biggar had a right to demand a hearing in front of an administrative law judge:

> Licensee has a right to demand that a hearing be held as soon as practicable to contest the emergency suspension order. Such a request must be made in writing and must be received in the Board's office no more than 90 days after the effective date of this order. If not so received, Licensee's right to a hearing under ORS chapter 183 will be waived. . . . Licensee may mail a request for hearing to Oregon Board of Optometry, 1500 Liberty St SE, Suite 210, Salem, OR 97302 or fax a request to 503.399.0705.

Biggar Depo., Ex. 115 at 4–5. The Emergency Order also warned Dr. Biggar: "[i]f you request a hearing, but later withdraw your request for hearing, fail to appear at the hearing, or notify the Board or the administrative law judge that you do not intend to appear at the hearing, you will have waived your right to a hearing." Biggar Depo., Ex. 115 at 5. On April 15, the Board issued an Amended Emergency Order, which added a sentence requesting that Dr. Biggar pay the costs of the disciplinary proceedings but otherwise did not alter the content from the original Emergency Order. Biggar Depo., Ex. 117.

Dr. Biggar responded on April 5 via email to Ms. Sneed and others, proposing several plans for his reinstatement. In the alternative, he wrote, "I would welcome an emergency in-person meeting with the Board[']s Legal Counsel, myself, and my own legal representation, at your office in Salem, if this is convenient for your team, and prior to April 6 @ 9am." Biggar Depo., Ex. 116. Although Dr. Biggar's operative Complaint alleges he asked for a hearing on

4 – OPINION AND ORDER

April 13 on the phone and in an email, these allegations do not appear in the record. Other than the April 5 email, Dr. Biggar testified that he does not recall asking for a hearing in writing. Biggar Depo. at 155.

### D. May 2016 Consent Order and Aftermath

Dr. Biggar signed a Consent Order on May 5, 2016, after advice from legal counsel. Biggar Depo., Ex. 118. The Consent Order required Dr. Biggar to seek mental health treatment and suspended him from practice until cleared by a mental health professional. Biggar Depo., Ex. 118. It also stated: "Licensee, aware of his right to a hearing and judicial review, does hereby waive those rights and agrees to the entry of this Consent Order." Biggar Depo., Ex. 118 at 2. Finally, the Consent Order noted, "[t]he Emergency Order is withdrawn and this Consent Order replaces all previous Board orders, including the Emergency Order." Biggar Depo., Ex. 118 at 5. After signing the Consent Order, Dr. Biggar did not attend the Board meeting scheduled on May 6, 2016. Biggar Depo. at 152–53. Dr. Biggar complied with the Consent Order and was allowed to resume practice on June 20, 2016. Biggar Depo. at 166–67.

On May 24, 2016, Dr. Biggar, via counsel, asked Ms. Sneed to take down the Amended Emergency Order from the Board website. Sneed Decl. [95] ¶ 8. Ms. Sneed replied that she had no authority to do so, but that the Board would address the issue at the next meeting. Sneed Decl. [95] ¶ 8. The Board then did so at a September 6, 2016 meeting, and voted to take down the Amended Emergency Order. Sneed Decl. [95] ¶ 9. Additionally, at the September 2016 Board meeting, the Board voted to require Dr. Biggar to complete 18 hours of glaucoma education by his license renewal date of November 1, 2017. Biggar Depo., Ex. 119.

Dr. Biggar's Lake Oswego practice closed in May 2017, and the Tillamook practice closed in October 2017. Biggar Depo. at 45. Dr. Biggar did not complete the required 18 hours of glaucoma education and let his license lapse on November 1, 2017. Biggar Depo. at 179.

5 – OPINION AND ORDER

Although it appears Dr. Biggar's license had expired, the Board also suspended his license on November 13, 2017 for failure to complete the required classes. Sneed Decl. [95], Ex. C.

## II. Procedural History

Dr. Biggar filed this suit in state court in March 2017 and Defendants removed to this court in May 2017. Notice of Removal [1]. In his Third Amended Complaint (TAC) (filed in November 2017 when he was still represented by counsel), Dr. Biggar alleges nine claims for relief against the Board and nine individual defendants: Ms. Sneed, six board members (Webber, Lynch, Cardenal, Tronnes, Louie, and Walker), former employee Ingrid Gander, and Dr. Joan Miller. TAC [43]. These claims are:

- Claim 1: Violation of Due Process (against the Board, Sneed, Webber, Cardenal, Tronnes, Louie, and Walker)
- Claim 2: Disability Discrimination under the ADA (against the Board)
- Claim 3: Breach of Duty of Confidential Information and Notice of Prior Disclosure under ORS 683.165, 676.180 (against the Board and Sneed)
- Claim 4: Violation of Duty of Notice for Public Hearings under ORS 192.610, 683.155 (against the Board and Sneed)
- Claim 5:
    - Count I: Breach of Contract (against the Board and Sneed)
    - Count II: Breach of Implied Covenant of Good Faith and Fair Dealing (against the Board and Sneed)
- Claim 6: Defamation (against the Board, Gander, Sneed, and Miller)
- Claim 7: Intentional Infliction of Emotional Distress (against the Board, Gander, Sneed, and Miller)
- Claim 8: Intentional Interference with Economic Relations (against the Board, Gander, Sneed, and Miller)
- Claim 9: False Light (against the Board and Sneed)

TAC [43] ¶¶ 54–107.

Dr. Miller filed an Anti-SLAPP Motion [54], which I granted [74]. She is therefore no longer a defendant in this case. There is an automatic stay in this case as to Ms. Gander, pursuant to her pending bankruptcy proceedings. Notice [12]. The remaining OBO Defendants filed the

6 – OPINION AND ORDER

present Motion for Summary Judgment, arguing summary judgment should be granted to the OBO Defendants on each of Dr. Biggar's claims.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The initial burden for a motion for summary judgment is on the moving party to identify the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that burden is satisfied, the burden shifts to the non-moving party to demonstrate, through the production of evidence listed in Fed. R. Civ. P. 56(c)(1), that there remains a "genuine issue for trial." *Id.* at 324. The non-moving party may not rely upon the pleading allegations, *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995) (citing Fed. R. Civ. P 56(e)), or "unsupported conjecture or conclusory statements," *Hernandez v. Spacelabs Medical Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). All reasonable doubts and inferences to be drawn from the facts are to be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

### I. Dismissal of Defendant Jessica Lynch

As the OBO Defendants note, Defendant Jessica Lynch, a Board member, is not named in any claim. She is therefore dismissed as a defendant, although the following absolute immunity analysis would also apply to her as a Board member.

### II. Claim 1: Violation of Due Process

Dr. Biggar argues he was denied due process by the Board, Sneed, Webber, Cardenal, Tronnes, Louie, and Walker because: (1) the Board failed to notify him of his hearing rights; (2) the Board failed to allow for a hearing after he requested one; and (3) the Board failed to fully

7 – OPINION AND ORDER

investigate the complaints against him before suspending his license. TAC [43] ¶¶ 53–56. He seeks non-economic and economic damages for these alleged violations. TAC [43] ¶¶ 57–59. Dr. Biggar brings this claim pursuant to 42 U.S.C. § 1983.

The OBO Defendants argue I should grant summary judgment to them on Dr. Biggar's claim for due process for numerous reasons. One argument is because the Board and its members are entitled to absolute immunity for their quasi-judicial and prosecutorial actions. Because I find absolute immunity dispositive of this claim,[1] I do not address the OBO Defendants' other arguments.

"Absolute immunity is generally accorded to judges and prosecutors functioning in their official capacities." *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). "Such immunity assures the independent functioning of executive officials acting in a quasi-judicial capacity, thereby ensuring that they can exercise their adjudicative discretion without fear of intimidation or harassment." *Id.* at 923. Courts have extended these protections in cases brought under 42 U.S.C. § 1983 to certain state officials, including "agency representatives performing functions analogous to those of a prosecutor or a judge." *Id.* This immunity may extend not only to the officials but also to the agency itself. *See id.* at 926.

To decide whether absolute immunity is warranted in a given case, courts utilize a "functional approach," as defined in *Butz v. Economou*, 438 U.S. 478 (1978). "In *Butz*, the Court outlined several nonexclusive factors that embody characteristics of the judicial process and aid in the determination of whether to grant absolute immunity." *Olsen*, 363 F.3d at 923. These factors include:

> (a) [T]he need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for

---

[1] I previously concluded that the Board was not immune from suit as an arm of the State of Oregon [32], but quasi-judicial or quasi-prosecutorial absolute immunity is a separate inquiry.

8 – OPINION AND ORDER

private damages actions as a means of controlling unconstitutional conduct; (c) the [agency's] insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985) (citing *Butz*, 438 U.S. at 512). The Ninth Circuit and several other Circuits have applied the *Butz* factors to conclude that absolute immunity applied to certain state medical boards and their members. *See, e.g.*, *Olsen*, 363 F.3d at 923; *Mishler v. Clift*, 191 F.3d 998, 1004 (9th Cir. 1999); *Wang v. N.H. Bd. of Registration in Med.*, 55 F.3d 698 (1st Cir. 1995); *Watts v. Burkhart*, 978 F.2d 269 (6th Cir. 1992) (en banc); *Bettencourt v. Bd. of Registration in Med.*, 904 F.2d 772 (1st Cir. 1990); *Horwitz v. State Bd. of Med. Exam'rs*, 822 F.2d 1508 (10th Cir. 1987).

After addressing the *Butz* factors, a court next must decide the scope of immunity in a given case, as "absolute immunity applies only to those actions which are judicial or closely associated with the judicial process." *Olsen*, 363 F.3d at 926. I address each of these steps in turn.

### A. The *Butz* factors

#### i. Need to assure that the individual can perform his functions without harassment or intimidation

The Board is "a semi-independent state agency" charged with the regulation and discipline of optometry professionals in Oregon. O.R.S. §§ 683.250; 683.270. The Board's powers include granting licenses and imposing sanctions such as "[r]evok[ing], suspend[ing] or refus[ing] to renew a license." O.R.S. §§ 683.140; 683.270. In *Olsen*, the Ninth Circuit reiterated that the role of a medical board to discipline physicians and other medical personnel invoked the need to assure freedom from harassment. The court concluded, "in view of the public interest of ensuring quality health care, there is a 'strong need' to make certain that Board Members can

perform these disciplinary functions without the threat of harassment or intimidation." *Olsen*, 363 F.3d at 924 (quoting *Mishler*, 191 F.3d at 1005). This is particularly true where a "Board's powers to discipline and potentially suspend a physician's license 'are acts that are likely to stimulate numerous damages actions' by disgruntled physicians." *Gambee v. Cornelius*, No. 10-cv-6265-AA, 2011 WL 1311782, at *4 (D. Or. Apr. 1, 2011) (quoting *Mishler*, 191 F.3d at 1005). Similarly, here the Board and its members perform quasi-judicial disciplinary functions that are likely to provoke "numerous damages actions"; immunity would therefore afford the Board protection from harassment. *See id.* ("Immunity therefore ensures that the Board can conduct these important activities without fear of harassment, in order to effectively address the strong public interest in quality health care."). This factor weighs in favor of granting absolute immunity to the Board and its members.

### ii. The presence of safeguards

In addressing this factor in *Mishler* and *Olsen*, the Ninth Circuit found it critical that the state medical board operated under a comprehensive statutory scheme and was governed by the state Administrative Procedure Act (APA). *Olsen*, 363 F.3d at 924; *Mishler*, 191 F.3d at 1005–06. In *Gambee*, this Court concluded that this factor weighed in favor of applying absolute immunity to the Oregon Medical Board (OMB), as the OMB is governed by a comprehensive statutory scheme and Oregon's APA, found at O.R.S. chapter 183. *Gambee*, 2011 WL 1311782, at *4. Similarly, here the Board is governed by a comprehensive statutory scheme, which details the Board's powers, duties, and restrictions on those powers and duties. O.R.S. §§ 683.010 *et seq.* Furthermore, like in *Gambee*, the Oregon APA governs the Board's disciplinary proceedings:

> Where the Oregon Board of Optometry proposes to refuse to issue a license, or proposes, where written charges have been filed with the board which the board considers sufficient to warrant a hearing, to impose any disciplinary sanction or

10 – OPINION AND ORDER

> civil penalty under ORS 683.140, opportunity for hearing shall be accorded as
> provided in ORS chapter 183.

O.R.S. § 683.155(1). As this Court noted in *Gambee*, these protections include the opportunity for a contested case hearing in front of an administrative law judge (ALJ), where a licensee may retain counsel, present evidence, and "rules of privilege, relevance, documentary evidence, and cross-examination generally apply." *Gambee*, 2011 WL 1311782, at *4 (citing O.R.S. §§ 183.615(1), 183.625(2), 183.417(1), § 183.450). As in *Gambee*, the Board's emergency suspension procedure does not allow for a pre-deprivation hearing, but the Board must adhere (and did so in this case) to the Oregon APA's provision which "allows emergency suspension of licenses in cases of 'serious danger to the public health or safety' and grants licensees a right to demand contested case hearings in response." *Gambee*, 2011 WL 1311782, at *4 (quoting O.R.S. §183.430(2)). Final orders must be written and include findings of fact and conclusions of law. O.R.S. § 183.470(1)–(2). Importantly, licensees have the right to seek judicial review in accordance with the Oregon APA. O.R.S. § 683.155(2).

Although Dr. Biggar alleges that the Board violated these procedures by failing to give him notice or a hearing, "[i]t is the available procedures, not the manner in which they are exercised in a particular case, that is the critical inquiry for determining whether there are safeguards that reduce the need for private damages actions." *Mishler*, 191 F.3d at 1006. In this case, as this Court concluded in *Gambee*, "the panoply of procedural safeguards on Board action provided by Oregon statutes reduces the need for private damages actions." *Gambee*, 2011 WL 1311782, at *5. This factor weighs in favor of granting absolute immunity to the Board and its members.

### iii. OBO's insulation from political influence

The *Olsen* court concluded that "the structure of the Board and 'the procedural requirements of their decision-making process'" are important considerations in assessing insulation from political influence. *Olsen*, 363 F.3d at 925 (quoting *Mishler*, 191 F.3d at 1007). Here, the Board is composed of four practicing doctors of optometry and one non-practitioner public member, all of whom are chosen by the governor. O.R.S. § 683.250(1)(b). In assessing the similar structure of the Idaho State Board of Medicine, composed of seven doctors, two public members, and the Idaho State Police director, the Ninth Circuit concluded "the risk that Board members will act out of financial self-interest is diminished by the presence of non-physicians on the Board." *Olsen*, 363 F.3d at 925. Additionally, here individuals may not be members of the Board if they are financially interested or otherwise directly associated with any school of optometry, and members of the board may not be financially interested in purchases, contracts, or sales before the Board. O.R.S. § 683.260. Finally, like in *Olsen* and *Gambee*, the state APA imposes procedural safeguards. *See Olsen*, 363 F.3d at 925; *Gambee*, 2011 WL 1311782, at *5. The structure of the Board and the procedural safeguards in place provide sufficient insulation from political influence. This factor weighs in favor of granting absolute immunity to the Board and its members.

### iv. Precedent, adversary nature, and correctability

The Oregon APA requires the application of precedent during judicial review, provides for adversarial proceedings, and ensures correctability via judicial review. *See Gambee*, 2011 WL 1311782, at *5 (citing O.R.S §§ 183.417(1), 183.450(3), 183.480, 183.482). As noted above, these provisions apply to the Board here. These three factors weigh in favor of granting absolute immunity to the Board and its members.

In sum, the *Butz* factors weigh in favor of applying absolute immunity to "the Board, . . . its members, [and] professional staff." *See Olsen*, 363 F.3d at 925.

### B. The scope of immunity

I next must decide which of the Board's actions were "judicial or closely associated with the judicial process." *Olsen*, 363 F.3d at 926. In this claim, Dr. Biggar challenges the Board's alleged failure to notify him of his hearing rights, failure to allow for a hearing, and failure to fully investigate the complaints against him. TAC [43] ¶¶ 53–56. Like in *Olsen*, these decisions are all part of "the eventual decision" of suspending Dr. Biggar's license and are therefore "directly related to [the Board's] adjudicatory function and the ultimate resolution of the disciplinary dispute at issue." *Olsen*, 363 F.3d at 928. "Such acts are inextricably intertwined with [defendants'] statutorily assigned adjudicative functions and are entitled to the protections of absolute immunity." *Id.*

Given that absolute immunity applies to each of the OBO Defendants' actions challenged by Dr. Biggar in this claim, I GRANT summary judgment to the OBO Defendants on Dr. Biggar's due process claim.

### III. Claim 2: Disability Discrimination under the Americans with Disabilities Act

Dr. Biggar alleges the Board discriminated against him in violation of the Americans with Disabilities Act (ADA) under 42 U.S.C. § 12132, by deciding to suspend his license and publicly reprimand him "without proper investigation or discussion of any accommodation." TAC [43] ¶ 64. The OBO Defendants argue that Dr. Biggar cannot establish a prima facie case of discrimination under the ADA.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.

13 – OPINION AND ORDER

§ 12132. In this context, a "qualified individual with a disability" is a person "with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2).

To establish a prima facie case of discrimination based on his disability in violation of the ADA, Dr. Biggar must produce evidence showing: (1) he was an individual with a disability; (2) he was qualified to receive the "benefit of the services" of the Board, i.e. to maintain his optometry license; and (3) he was "denied the benefits of the services, programs, or activities of a public entity"; or (4) he was subjected to discrimination by a public entity. *See* 42 U.S.C. §§ 12131(2), 12132; *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816, 822 (9th Cir. 1999), *as amended* (Nov. 19, 1999).

Assuming Dr. Biggar is an individual with a disability and was denied the benefits of the services of the Board, a public entity, I nevertheless conclude he has failed to establish that he was qualified to receive the services of the Board at the time it suspended his license. "[A]n individual is qualified to participate in a program if he meets the essential eligibility requirements for participation in the program, with or without reasonable accommodations." *McElwee v. Cty. of Orange*, 700 F.3d 635, 643 (2d Cir. 2012) (citing 42 U.S.C. § 12131(2)).

"Lack of impairment" is an essential eligibility requirement to remain licensed as an optometrist in Oregon. *See* O.R.S. § 683.140(g). As is relevant here, O.R.S. § 676.303(1) defines impairment as "an inability to practice with reasonable competence and safety due to . . . a mental health condition." The Board is specifically charged with disciplining optometrists for "impairment" in the profession, as the Board did in Dr. Biggar's case. O.R.S. § 683.140(g); Biggar Depo., Exs. 117, 118. And Oregon law requires that "[a]ll health professional regulatory

boards shall operate with the primary purposes of promoting the quality of health services provided, protecting the public health, safety and welfare by ensuring that licensees practice with professional skill and safety and addressing impairment among licensees." O.R.S. § 676.303(2).

But Dr. Biggar does not claim or put forth evidence that he was able to practice optometry with reasonable competence and safety at the time the Board suspended his license. *Cf. Hason v. Med. Bd. of Cal.*, 279 F.3d 1167, 1173 (9th Cir. 2002) (concluding at motion to dismiss stage that physician adequately alleged he was qualified, where he alleged "that by the time of the Medical Board's decision he had received treatment for his disability and was capable of practicing medicine"). The only evidence in the record that provides any information on Dr. Biggar's ability to practice optometry when the Board suspended his license in April 2016 is Dr. Goldmann's report. Biggar Depo., Ex. 114 at 7. And Dr. Goldmann expressly stated that Dr. Biggar was not fit to practice optometry at the time. Biggar Depo., Ex. 114 at 7.

Dr. Biggar's other evidence does not speak to his ability to practice at the time of the suspension. Dr. Biggar points to a report by Dr. Conti, who concluded that Dr. Biggar was fit to practice if he continued mental health treatment. Biggar Affidavit [98]; Conti Report [98]. But Dr. Conti's report is dated June 12, 2016, immediately before the Board reinstated Dr. Biggar's license on June 20, 2016, and several months after the Board suspended his license. Therefore, Dr. Conti's report does not speak to Dr. Biggar's capability to practice optometry at the time of his suspension.

It also appears that Dr. Biggar disputes the claim that he was a danger to patients. Dr. Goldmann did conclude, "Dr. Biggar did not present any symptoms during the interview suggestive of imminent danger to patients or employees." Biggar Depo., Ex. 114 at 5. However, the definition of impairment and the Board's orders are broader than danger to others;

impairment means the inability to practice "with reasonable competence and safety." O.R.S. § 676.303(1). Therefore, even if Dr. Biggar was not a danger to patients, he could still be incapable of practicing optometry at the time of his suspension.

I conclude that Dr. Biggar has not put forth evidence that he was a "qualified" individual under the ADA, because he has not presented evidence to dispute that he was capable of practicing optometry "with reasonable competence and safety" at the time of his suspension. His prima facie case of discrimination therefore fails, and I GRANT summary judgment to the Board on this claim.

## IV.   Remaining state law claims

This case was removed from state court, and given the dismissal of the due process and ADA claims, only state law claims remain. Generally, "[w]here a district court dismisses a federal claim, leaving only state claims for resolution, it should decline jurisdiction over the state claims." *Wade v. Reg'l Credit Ass'n*, 87 F.3d 1098, 1101 (9th Cir. 1996). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity— will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Here, I conclude these factors point in favor of remand: the remaining state law claims are not similar to the federal claims, and some claims, particularly Claim 3 for breach of duty of confidential information under O.R.S. §§683.165, 676.180, involve complex questions of state law. I therefore conclude that remand is warranted on the remaining state law claims.[2]

---

[2] Although there is an automatic stay in this case as to Ms. Gander, the Ninth Circuit concluded in an unpublished case that an automatic stay is not violated by dismissal of claims where "the determination regarding dismissal does not involve the merits of the case." *Lindley Contours, LLC v. AABB Fitness Holdings, Inc.*, 414 F. App'x 62, 63 n.1 (9th Cir. 2011) (unpublished) (citing *Dean v. Trans World Airlines, Inc.*, 72 F.3d 754, 756 (9th Cir. 1995)). Here, the

16 – OPINION AND ORDER

## CONCLUSION

For the reasons stated above, I GRANT in part the OBO Defendants' Motion for Summary Judgment [93]. I GRANT summary judgment to OBO Defendants on the federal due process and ADA claims (Claims 1 and 2). Because Claim 1 was the only claim alleged against the individual Board members, this decision in effect dismisses Defendants Webber, Lynch, Cardenal, Tronnes, Louie, and Walker from this case. With only state law claims remaining against the Board and Defendants Sneed and Gander, I REMAND this case to Multnomah County Circuit Court.

IT IS SO ORDERED.

DATED this 26 day of June, 2018.

MICHAEL W. MOSMAN
Chief United States District Judge

---

decision to decline supplemental jurisdiction does not involve the merits of the case and "has no impact on the debtor's assets, does not impact the relative position of creditors, and would not interrupt debtor's 'breathing spell' and thus does not conflict with the purposes of the automatic stay." *Id.* This order of remand therefore applies to the claims against Ms. Gander.

17 – OPINION AND ORDER